General Hamilton,
in the 82d number of The Federalist, upon the subject of exclusive delegation of authority to the general government, remarks that “ this exclusive delegation can exist only in one of three cases; where an exclusive authority is in express terms granted to the union; . or where a particular authority is granted to the union, and the exercise of a like authority is prohibited to the states; or where an authority is granted to the union, with which a similar authority in the states would be utterly incompatible. Though, these principles may not apply with the same force to the judiciary as to the legislative power, yet I am inclined to think they are, in the main, just with *776 respect to the former as to the latter. And under this impression I shall lay it down as a rule, that the state courts will retain the jurisdiction that they now have, unless it appears to be taken away in one of the enumerated modes.” These remarks are equally as applicable to power delegated by our constitution, which is the law paramount of the state, as to the power delegated by the constitution of the United States, which is the law paramount of the union.
Now as the words of the constitution are, not that he shall have exclusive power; nor even the power which might imply the whole power; but it is more guarded, and is simply “ shall have power” ; and as there are no express words excluding concurrent jurisdiction, nor any phraseology which implies that the whole power shall be vested in the governor, and as the constitution has expressly declared that the common law shall be and continue the law of the state, excepting so far as it is repugnant to the constitution, it follows, that unless the power of the governor is of such .a nature as to be repugnant to the qualified limited power claimed by the judges, their power remains; and that they do, as in the words of his excellency, look for their powers in the grants of the constitution ; and this as fully as if the constitution had said *that they should have all their common law powers in cases of reprieve, excepting so far as it is repugnant to the constitution. That concurrent power can exist over the same subject matter, and yet not be repugnant, is apparent. If, after the governor had reprieved, the court should order an execution, or if the governor had the power of ordering an execution, and should exercise it, and the judges should reprieve, then the interference of the judges would be an act repugnant to his power. But his power is of granting reprieves and pardons, and a temporary reprieve by the judges, “ so as to give room to apply to the executive,” lays no barrier in the way of his executing his power in its most ample extent. It is, on the contrary, auxiliary to that power ; and in the present instance, it afforded him an opportunity of doing, upon á new statement of facts, what *777 ne forever would have been precluded from doing if the sentence had not been respited. It is solely for this purpose, and is so declared in the books; and to such extent only as is necessary “ in order to give room to apply” to the executive to exercise his prerogative.
Far be it,from me to call in question the wisdom of placing the power of granting reprieves and pardons in the executive. All that I contend for is, that although he indubitably has the ultimate or superior power, and that there is no power which can prevent him from reprieving, yet that there is nothing in the constitution annulling the qualified limited power of the judges. Constitutions like laws should receive such a construction as will advance the remedy and suppress the mischief. The object of this provision is to enable the executive in all cases to prevent injustice. The limited power of the judges is only to remove ah obstruction of their own creating, in the way to the mercy seat; a power necessary to enable the executive to exercise his prerogative upon every suitable occasion ; a power which has been sanctioned by the experience of our ancestors for ages, and which was the offspring of the imperious dictates of justice and humanity. That which I contend against is a harsh and rigid construction of the constitution, which would insure a haste in shedding of blood, as foreign to the humane spirit of our criminal code as to the benign precepts of our religion. *Even in England, notwithstanding the jealousy with which the crown has ever guarded its prerogatives, it has never been considered an encroachment. The argument that this power has not been before exercised in this state, is of no force, unless it can be shown that the judges have refused to exercise it upon suitable occasions. The non-exercise of a power does not annul it. It is true, as stated by his excellency, that.courts may arrive at a conclusion that a prisoner is innocent, whom theg before pronounced guilty; and if they should, it would be either in consequence of new evidence, or of different views of the same evidence. If the former, (as in the present case,) there would be nothing extraordinary in it • and if the latter, it would only *778 prove that their sense of justice rose superior to their pride of opinion.
In adverting to the history of our government, I can discover nothing to warrant the inference that it was intended to divest the judges of this power. It certainly did not accord with the temper of the times when the constitution was adopted, to invest the governor with more than kingly powers; nor to pay less respect to the safety of the citizen than was paid by the crown to that of the subject. Why, then, are we to presume that the convention intended to remove from the citizen a safeguard, to abrogate a power, which, in its operation in the mother country, had often been instrumental in preventing injustice ? Why, when the want of such a power, might leave upon the land the stain of innocent blood ?
But against the reasonableness of this construction, it is urged by his excellency, that there is a court of oyer and terminer in every county, and that this power in the courts might be abused to such an extent as completely to overthrow the power of the executive in this respect. Arguments against the exercise of power, because it may be abused, are of no legal validity. The law will not presume that its officers will abuse their trust. Were it otherwise, it might be shown by the same course of reasoning, that under the constitution the courts have not the power of fixing the time of execution, for if they have, they might order the execution forthwith, which would oust the executive of his prerogative *of pardoning, or they might order an execution at so remote a period, as would render his prerogative of reprieving of no avail. So, on the other hand, the executive, by the indiscriminate exercise of the pardoning power, might prostrate the criminal justice of the state.
But how stands the experience of the mother country, as it respects abuse arising from the number of courts of oyer and terminer? In Englanc^and Wales there are 52 counties, and of course 52 courts of oyer and terminer are annually organized in them.
Yet, immemorial experience has proved that ho abuse has ensued from their powers. Surely it will not be contended *779 that the framers of the constitution considered our courts as less trustworthy than those of England. Surely, after investing them with the most delicate, the most responsible of all power, that of passing upon the lives of their fellow beings, they would not hesitate to invest them with the newer of deferring the execution of their own sentence so ong as would enable a miserable victim to seek the mercy seat, when the stern dictates of justice demanded it. Human nature revolts at the idea of executing one who has become a lunatic, a woman quick with child, or one whom subsequent developments have clearly shown to be innocent. And yet, if the exposition of the constitution by his excellency is correct, all those consequences might ensue, provided the settled paramount law of the land 'is permitted to take its course.
But his excellency, realising the necessity of the case, says, that upon such exigencies, “ In all probability, the sheriff, relying on the justice of his country, might take the risk upon himself, and, without any pretence af authority, exercise mercy upon, indeed, an awful responsibility.” But the sheriff could not do this without violating his oath of office; he could not do it without trampling upon the authority of the judicial tribunals; he could not do it but by acting upon a principle which, if extended, would destroy the due subordination and harmony of the government. But what if he should insist upon doing his duty as required by law 1 The moral sense of a whole community might be outraged *at witnessing the execution of an innocent man; a scene, which of all others, would be most liable to excite them to tumult and outrage.
His excellency seems to have rested under the impression that the interference of the judges in this case was “ by a sudden and powerful attempt upon their humanity.” I trust that a full development of the motives which governed them will show there was no want of becoming firmness upon the occasion, and that their conduct ought rather to be ascribed to a due regard to the rights of the prisoner and the public justice of the land.
The evidence of the murderous disposition of the priso *780 ner was derived mainly from the testimony of the boy, and the subsequent declarations of the prisoner.
In the deposition of the boy before the coroner of New York, (which was not read on the trial,) he swore, among other things, that the prisoner knocked the deceased into the boat alongside the sloop, knocked him down again with his fist, stamped upon his face, and continued inflicting blows with his fist, sticks and stones, about one half an hour ; that he continued beating him from Fort Gansevoort to Spuyten Duyvel creek; that he then threw him overboard, and pulled him in again; that the prisoner then stamped upon him, and beat him with his fist, and struck him several blows with a handspike on his head and face.
In an examination before the judges on the day the reprieve was granted, he stated that the prisoner struck the deceased more than one hundred blows with a handspike, sticks of wood, stones, ropes, and by kicking and stamping upon him. The two very respectable physicians who "were examined on the trial, both said that they examined the body critically ; that there were no marks of violence excepting on the head, and there only three, one under each eye, and that, which was the mortal one, on the right temple; This wound one stated, “had an appearance as though produced by a club or falling on a stone.” And the other one said, “ that falling on a sharp edge, as the gunwale of a boat, would have done it.” The statement of the physicians as to the number of marks being so totally inconsistent with those of the boy *as to the number of blows, and being satisfied at the time of the reprieve, as well from personal examination of him, as from the testimony of his teachers, of the extreme imbecility of the boy; and also noticing various discrepancies in-his testimony at different times, and the very improbable account which he gave of the whole transaction, it was not considered safe or consistent with the humane spirit of our laws, to repose any confidence in his testimony. The testimony of this witness, therefore, which was all the evidence of the shocking. details of the case was laid aside.
As to the brutal declaration of the prisonei on board *781 Capt. Green’s vessel on surrendering himself, which was sworn to by one of the witnesses, and which bore powerfully against him on the trial, it does not appear from the deposition of Capt. Green, before the coroner of Westchester, (but which was not read on the trial) that he made any such declarations, although he states what the prisoner did say. Two other men swore at the same time that the statement made by Capt. Green was correct, and a third, that he was not present all the time, but that it was correct as far as he had heard it. Capt. Green was sick, and unfortunately not present on the trial. He has subsequently stated, in the hearing of Alderman Thorp, that the prisoner did not make use of a rash expression, but gave a reasonable account of the business. He also made statements which went in explanation of the declaration of the prisoner at Sing Sing. This came to the knowledge of the judges on the day the reprieve was granted. But as Green was then absent, his deposition could not be taken.
Under these circumstances, as those witnesses were of course sworn to tell the whole truth, the judges could not in justice to the prisoner, visit upon him the declarations as testified to.
On the trial our attention was particularly directed to the inquiry, whether the deceased did not come to his death by being knocked into the boat. But one of the physicians stated, that in his opinion he could not have moved again after receiving the blow on the temple.' This opinion bore strongly against the prisoner on the trial, because, after being *knocked into the boat, he was again on board the vessel. Subsequently to the trial, however, a number of our most respectable physicians certified that he might have moved for some time after it.
The case, then, stripped of the inconsistent parts of the testimony of the boy, and the violent declarations of the prisoner, resolved itself mainly into this; that the deceased, who was a stranger to the prisoner, attempted to take the helm from him who had the command, and was thereupon Knocked into the boat which lay alongside of the quarterdeck, and received the mortal wound by the fall; and that *782 a^'erwal"^s riie prisoner hailed Gapt. Green’s sloop, stated had a dead man on board, and had killed him in his own defence, surrendered himself a prisoner, and wished to be taken to New York for trial. And this would unques tionably be nothing more than manslaughter. There are other facts in the case; but, as I apprehend they do not, as far as satisfactorily attested to, materially vary the view 1 have taken, I shall forbear entering into a further enumeration, as the testimony was reported at length to the executive.
Upon a consideration of all the circumstances, the judges and the district attorney were of opinion that the evidence, . taken in connection with the facts subsequently disclosed, was not such as would justify the execution of the prisoner; and he was reprieved to such time as would enable the executive to become fully informed of the case, and afford him an opportunity of exercising his prerogative, if he should deem it proper. 1
Believing, as it was natural we should, that the new facts and views, which had wrought so radical a change in the minds' of the judges and of the district attorney, would at least have created so much doubt in the mind of his excellency as to the guilt of the prisoner, as would, in the humane spirit of our laws, have rendered his execution unjustifiable, it was with much surprise thaf I learnt, upon perusing hia excellency’s letter, that, to use his own expression, “he might still believe him guilty of the crime of murder,” and that he was compelled “by the extraordinary circumstances, embarrassment, *and perplexities, arising from the reprieve by the judges, to interfere with a conditional par don.” Or, in other words, but for the reprieve, his excellency would have suffered the prisoner to have been executed. How the dispensing with the execution could have been necessarily consequent upon the reprieve, I do not distinctly apprehend; for his excellency himself, in the case of Diana Selick in this city, reprieved her for a limited period, and then suffered her to be executed. In the mother country, reprieves are not considered as giving any claims for pardon; and executions after them have fre *783 quently taken place. In the case of Miller, .no difficulty was created as respected the prisoner, by the reprieve of the judges ; for he was given distinctly to understand that he was not to infer from it that the governor would interfere ; that it was merely the act of the judges to give the governor time to look into the case, and afforded no indication of what might be his opinion.
I have now given a full exposition of the views of the judges, both as to the law and the facts. It was under these circumstances, arid resting under a conviction that upon his excellency being fully informed of the case, he would conceive it to be his duty to reprieve, that we were reduced to the alternative of their suffering the prisoner to be led out to execution, or of repreiving him.
But reverse the picture. Suppose that the judges had refused to reprieve, and the governor, upon being fully informed of the case, had, in pursuance of their expectations, conceived it to be his duty to reprieve him, but that the prisoner had in the mean time been executed ! what judgment would a moral community have then formed of their conduct ?
In conclusion, I consider it my duty to state, that I realise most sensibly the delicacy, the novelty of the situation of an important judicial tribunal being arraigned by the chief magistrate at the bar of the public. Under no ordinary c;r cumstances would I be brought to consider it as consistent with a due respect to the dignity of the court over which I have the honor to preside, or to the sovereignty of the people who placed me there, and whose laws are there administered, to answer to such a call. But, as it was the chief magistrate *who has thus arraigned them, on a charge of encroaching upon his constitutional powers, and an intimation that, in the case in question, they probably acted under the impulse of feeling, instead of the guidance of judgment; and as the tone of his letter seems to imply that he possessed the exclusive power of expounding the constitution, so far as it respects the powers of the executive, I could not reconcile silence to my sense of duty.
By the arrangements of our constitution, the judicial *784 tribunals are bound to expound the constitution and laws, according to the best of their own judgment; and in the discharge of their trust, know of no superior controlling power but the courts of superior jurisdiction and the legislature. And although they will always carefully endeavor to keep within the scope of their powers, and will ever pay due respect to any suggestions from the executive as to the bearing of their decisions upon his prerogatives, yet in the discharge of their duties, I trust they will ever look, and look solely, to the constitution and laws for their government, and will never hesitate to follow where they and justice lead the way. I have the honor to be, very respectfully, your obedient servant,
Ogden Edwards.